NOT FOR PUBLICATION

## United States District Court
## for the District Of New Jersey

| | |
|---|---|
| DAVID J. CAIVANO,<br><br>            Plaintiff,<br><br>   v.<br><br>PRODUCTION WORKERS UNION LOCAL 148, PRODUCTION WORKERS UNION LOCAL 148 WELFARE FUND, PRODUCTION WORKERS UNION 148 LOCAL 148 PENSION FUND, ABC CORP, INTERNATIONAL UNION OF ALLIED NOVELTY AND PRODUCTION WORKERS, AFL-CIO,<br><br>           Defendants. | Civil No.: 13-5746 (KSH)<br><br><br>**Opinion** |

**Katharine S. Hayden, U.S.D.J.**

Although the complaint filed by plaintiff David Caivano in New Jersey Superior Court contained only state-law causes of action, the defendants removed the matter to this Court on the theory that the claims are exclusively governed by the civil-enforcement provision of the federal Employee Retirement Income Security Act (29 U.S.C. § 1001 *et seq.*), commonly known as ERISA. Caivano has moved to remand [D.E. 10]. His position, as expressed in his papers and at oral argument, is that the defendants are misconstruing his claims, and that the obligations owed to him arise from independent legal duties entirely separate from ERISA. For the reasons that follow, because the defendants have not met their burden to show federal subject-matter jurisdiction, the motion to remand will be granted.

1

**I. Background**

A) <u>The Parties and Caivano's Employment History</u>

Defendant International Union of Allied Novelty and Production Workers (the "International") is an AFL-CIO-affiliated union based in Chicago, Illinois.  It is the parent organization of defendant Production Workers Union Local 148 ("Local 148" or "the Local"), a labor union based in Jersey City.  Defendants Local 148 Welfare Fund—which manages and administers the Local's health benefits—and Pension Fund are employee benefit plans as defined by ERISA, 29 U.S.C. § 1002(1) and (2), and are also located in Jersey City.  (Local 148 and its Funds, jointly represented, are the "local defendants.")

Caivano worked for the local defendants in varying capacities for 13 years: from 1999 until August 2012, when he was fired.  In his complaint [D.E. 10-2], which he filed in Hudson County Superior Court in August 2013, he alleged that he was originally hired by the International in 1999 to serve as a deputy trustee of Local 148, during a period when Local 148 was under the trusteeship control of the International.  (Compl. ¶¶ 8–9.)  According to the timeline established in the complaint (and which the defendants generally do not dispute), Caivano worked for Local 148 from 1999 to 2006, becoming a direct full-time employee of the Local after the International's trusteeship period ended in 2004.  (Compl. ¶¶ 5, 9.)  Around 2004, he became the secretary treasurer and recording secretary of the Local's executive board.  These positions required him to maintain the Local's books and records, sign checks, and keep minutes from the general membership meetings.  He was also elected to serve as a full-time officer of the Local in an unpaid position.  (Compl. ¶¶ 9, 13.)

Caivano changed primary jobs in January 2007, when he transferred to the Welfare Fund itself. (Compl. ¶ 6.) That year, he became administrator of both the Welfare and Pension Funds. As administrator, Caivano dealt with vendors, liaised with the third-party claims processor for the Welfare Fund, and otherwise oversaw and supervised the Fund staff while conducting maintenance and upkeep on the Fund's office building in Jersey City. (Compl. ¶¶ 10, 12, 15.)

Although Caivano was not an employee of the Local after 2007, he remained affiliated even after he switched over to the Fund, serving (on an unsalaried basis) as a deputy trustee, trustee, or member of the Local's executive board through August 2012. (Compl. ¶¶ 7, 10, 14.) He also stayed on as the executive board's secretary-treasurer through August 2012. (Compl. ¶ 16.)

B) Medical Coverage, Lifetime Benefits, and Severance

According to Caivano, while he was a Local employee he was entitled to health-insurance coverage. For a time, he declined the coverage both because he was covered by his wife's employer's plan and because trustees and legal counsel of the Union had informed him that he would receive an equivalent cash payout instead. (Compl. ¶¶ 17–20.) Allegedly, longstanding Union policies in place since 1993 also required the Local to extend lifetime medical benefits to officers whose employment was terminated. (Compl. ¶ 27.)

Caivano further contends that the Local adopted a severance-pay policy in the early 1980s—since re-codified during various meetings of the executive board and general membership—that granted departing Union officers severance pay pegged to their years of service. (Compl. ¶¶ 22–23.) In its current form, the alleged severance-pay policy provides that certain officers receive, upon their retirement, 2½ weeks' pay per year. (*See* Compl. ¶ 26.)

According to the complaint, "several retiring employees and officers" have received severance under this plan.  (Compl. ¶ 24.)

C) Termination

In the complaint, Caivano relates that in and around 2007, he learned that Local 148 was engaging in alleged financial improprieties: specifically, that it was paying excessive salaries to certain of its employees (thereby running at a large deficit) and comingling funds with the Welfare Fund.  (Compl. ¶ 32.)  Worried that these practices would lead to financial instability, he shared his concerns about the excessive salaries with the Local's counsel, non-party Michael Scaraggi, and its president, non-party Stephen Arena.  Arena rebuked him, and Scaraggi—who claimed to be "unable to take any action" to address the issues—told Caivano that he and the entire executive board could be held personally liable for the president's financial decisions.  (Compl. ¶¶ 34–38.)  Caivano made a record of the conversations with Arena in a logbook.  (Compl. ¶ 36.)  He also frequently spoke to non-parties Greg Auteri, the accountant for the Local and its Funds (and a close friend of both Local and International leadership), and Mark Spano, the president of the International.  Neither provided assistance, and Spano told Caivano to keep the conversation to himself (Caivano nevertheless recorded it in his logbook).  (Compl. ¶¶ 39–42.)

Later, according to Caivano, Scaraggi suggested that he meet with non-party Walter Maher, an agent of the New Jersey Department of Labor (NJDOL).  Scaraggi had already discussed the various issues with Maher and had recommended an audit by the agency.  (Compl. ¶¶ 43–44.)  Caivano and Maher met in April 2008, the former airing his concerns and frustrations about the Local's financial condition and his inability to do anything to correct the

problems; he later recorded the substance of the meeting in his logbook.  (Compl. ¶¶ 44–48.)  At

a second meeting, Caivano allegedly gave Maher more information about salary practices and

about Arena's attempts to hire individuals who were not allowed to work for labor unions.

(Compl. ¶¶ 49–50.)  Maher referred Caivano to another NJDOL investigator who questioned him

in April 2008 about corruption allegedly in the Local and elsewhere.  (Compl. ¶ 52.)

Less than a month after the final meeting, the NJDOL began a full audit of Local 148's

financial records.  (Compl. ¶ 53.)  During the months-long investigation, Caivano did not

disclose to anybody else that he and Scaraggi were the cause of it.  (Compl. ¶ 54.)  In 2009, on

Scaraggi's advice and pursuant to a subpoena, Caivano surrendered copies of his logbooks.

(Compl. ¶ 57.)

As a result of the audit, federal prosecutors charged Caivano and Local president Arena

in a 29-count indictment with conspiracy to embezzle and substantive embezzlement.  Caivano

was arrested on September 21, 2010.  While the criminal case against him went forward,

Caivano remained employed by the Fund, but his health deteriorated, and he was hospitalized for

significant periods of time during 2011 and 2012.  (Compl. ¶ 64.)  Meanwhile, the leadership of

both the Local and International discovered his role in the audit.  (Compl. ¶¶ 60–62.)

By letter of August 29, 2012—about two years after he was indicted, and close in time to

the discovery of his disclosures to the NJDOL—Caivano was fired from the Welfare Fund

without explanation.  He was on unpaid medical leave from the Fund at the time.  (Compl.

¶¶ 65–66.)  Caivano specifically alleges that the International terminated him in retaliation for

disclosing information to the NJDOL.  (Compl. ¶ 67.)

In January 2013, Caivano pleaded guilty to a one-count superseding information that

charged him with a misdemeanor: unlawfully engaging in a financial transaction with a labor

union, specifically by making an improper loan to an employee and officer of the Local resulting in a total level of indebtedness in excess of $2,000.  The indictment was dismissed at sentencing, and Caivano received a three-year probationary sentence and was ordered to pay restitution in the amount of $110,000 to the Welfare Fund.

## II. Procedural Background

A) <u>The Complaint</u>

Caivano's complaint in state court contained seven counts, each under a different state-law cause of action.

As acknowledged by the parties, the counts can be divided into two groups: employment-related and contractual.  The employment-related counts invoke two statutory bases for relief—the Conscientious Employee Protection Act (CEPA, N.J.S.A. § 35:19-1 *et seq.*) and the Law Against Discrimination (NJLAD, N.J.S.A. § 10:5-1 *et seq.*)—and common-law wrongful discharge.  The contractual counts advance common-law breach of contract, promissory estoppel, unjust enrichment, and breach of implied covenant of good faith and fair dealing claims.

B) <u>Removal</u>

Within thirty days of being served, *see* 28 U.S.C. § 1446(b), the local defendants filed a notice of removal pursuant to 28 U.S.C. §§ 1331 and 1441(a), to which the International consented.[1]  (*See* Consent to Remove [D.E. 4].)  The local defendants contended that Caivano

---

[1] The complaint also named an "ABC Corp." in the caption, but did not mention that defendant further in the body either directly or by implication.  "[T]he general rule that all defendants must join in a notice of removal may be disregarded where, as here, the non-joining defendants are

was "suing as a purported participant in" the Welfare and Pension Funds, and was seeking damages that included "lifetime medical benefits and pension benefits." "Such action," they wrote, "is cognizable under ERISA, 29 U.S.C. [§] 1132(a)(1)(B)," over which federal courts have jurisdiction per 29 U.S.C. § 1132(e). (Notice of Removal ¶ 9.)

C) Motions to Remand and to Dismiss

Caivano filed a motion to remand to Superior Court [D.E. 10], *see* 28 U.S.C. § 1447(c). He argued that the defendants had mischaracterized his complaint and that the Court lacks subject-matter jurisdiction. The local defendants opposed. International also moved to dismiss the complaint and Caivano filed opposition. The local defendants did not join the motion to dismiss.

### III. Caivano's Motion to Remand

Caivano asserts that his complaint does not raise federal claims, and that the defendants' arguments to the contrary are based on a "fundamental mischaracterization" of his claims. (Caivano's Moving Br. 14.) In his papers and at argument, Caivano stressed three key points: first, it is not relevant to removal that some of the defendants are ERISA entities; second, as the defendants conceded at argument, he was fired while sick and on unpaid leave, *before* he pleaded guilty to a misdemeanor count; and third, the contractual claims arise out of independent legal obligations on the part of the Local and International and are not grounded in the ERISA plans of the Funds.

---

unknown." *Green v. Am. Online (AOL)*, 318 F.3d 465, 470 (3d Cir. 2003); *see also Michaels v. State of N.J.*, 955 F. Supp. 315, 319 (D.N.J. 1996) (Barry, J.).

A) Removal Under ERISA

Under the well-established doctrine of "complete preemption," state-law claims that fall

within the ERISA civil-enforcement mechanism, 29 U.S.C. § 1132(a),[2] are converted into the

corresponding ERISA claims and become, as a result, removable to federal court.  A claim is

completely preempted and removable only if 1) the plaintiff could have brought his claim under

§ 1132(a), *i.e.*, he has standing to do so and is asking for the relief offered by the statute; and 2)

no other legal duty supports the claim.  *Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare*

*Reimbursement Plan*, 388 F.3d 393, 400 (3d Cir. 2004) (citing *Aetna Health Inc. v. Davila*, 542

U.S. 200, 210 (2004)).  Complete preemption is different from "express" or "conflict"

preemption, which arises out of 29 U.S.C. § 1144(a) and does not itself make a claim removable.

*Dukes v. U.S. Healthcare*, 57 F.3d 350, 355 (3d Cir. 1995).

The defendants bear the burden of showing that the claims they seek to remove satisfy

both prongs of the *Pascack Valley* test.  *Pascack Valley*, 388 F.3d at 401.  The scope of the

removal statute is strictly construed and all doubts are resolved in favor of remand.  *Abels v.*

*State Farm Fire & Casualty Co.*, 770 F.2d 26, 29 (3d Cir. 1985).

---

[2] That section reads, in pertinent part:
A civil action may be brought—
    (1) by a participant or beneficiary—
        (A) for the relief provided for in subsection (c) of this section, or
        (B) to recover benefits due to him under the terms of his plan, to enforce
        his rights under the terms of the plan, or to clarify his rights to future
        benefits under the terms of the plan;
    (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate
    relief under section 1109 of this title;
    (3) by a participant, beneficiary, or fiduciary
    (A) to enjoin any act or practice which violates any provision of this subchapter or
    the terms of the plan, or
    (B) to obtain other appropriate equitable relief
        (i) to redress such violations or
        (ii) to enforce any provisions of this subchapter or the terms of the plan.

8

B) Employment Claims

Counts 1 through 3 of the complaint allege that the defendants improperly terminated Caivano because of his disabilities and because of his whistleblowing.  It is undisputed that he was fired before he pleaded guilty to the misdemeanor count, while employed at the Welfare Fund and having served on the executive board of the Local.

As a preliminary matter, Caivano's claims are not removable simply because some of the defendants are ERISA plans.  "[O]rdinary state law or common law claims may be asserted against an ERISA plan" without implicating ERISA.  *Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 150 (3d Cir. 2007).  Further, "ERISA does not preempt a wrongful discharge action where the claimed loss of pension benefits was an aspect of plaintiff's damages, but not the basis of plaintiff's lawsuit."  *Ryan v. P.R. Maritime Shipping Auth.*, 848 F. Supp. 33, 38 (D.N.J. 1994) (Lifland, J.).

Instead, wrongful termination claims are removable only if they could be brought under ERISA § 510, 29 U.S.C. § 1140, an anti-retaliation provision enforced through § 1132(a)(3) that allows a civil suit to be filed by a participant, beneficiary, or fiduciary.  *See Eichorn v. AT&T Corp*, 484 F.3d 644, 651–53 (3d Cir. 2007).  Section 1140 prevents retaliatory action taken with certain "benefits-defeating motives" or against whistleblowers who have "given information or ha[ve] testified or [are] about to testify in any inquiry or proceeding" pertaining to ERISA.  29 U.S.C. § 1140.  The Third Circuit has found complete preemption when a complaint contained allegations that an employee was fired solely so that the employer could "avoid paying health and retirement benefits."  *Wood v. Prudential Ins. Co. of Am.*, 207 F.3d 674, 677 (3d Cir. 2000).  In other words, the impermissible intent should be "*the* motivating purpose" behind the termination.  *Id.* at 676 (emphasis added).

Applying the foregoing, the Court turns first to the NJLAD claim in count 3.  Under the NJLAD, an employer may not fire an employee because that employee is disabled.  *See* N.J.S.A. § 10:5-12(a).  The statute defines "disabilities" to include those arising from illness.  N.J.S.A. § 10:5-5(q).  Although Caivano does not elaborate on his exact illness, he does say that it was serious enough to require lengthy hospitalization, and that at the time he was fired he was on unpaid medical leave.  (Compl. ¶¶ 64–65.)

Caivano alleged in the complaint that the Fund knew of his disability, that he was a protected class under the NJLAD, and that he could perform his tasks as Fund administrator with accommodations; the defendants failed to provide for reasonable accommodations and then terminated him because he was disabled.  (Compl. 18–19.)  The complaint contains no details of how these circumstances might have affected his eligibility for benefits, and the defendants have not provided any.  *Cf. Joyce v. RJR Nabisco Holdings Corp.*, 126 F.3d 166, 173–74 & n.5 (3d Cir. 1997) (NJLAD claim alleging failure to accommodate a disability was neither completely preempted nor expressly preempted by ERISA).  The Court finds that the claim does not fall within the scope of § 1140 and is thus not converted into a federal claim by ERISA.

Count 1 of the complaint sounds under CEPA.  "The purpose of CEPA is to protect employees who report illegal or unethical work-place activities."  *Barratt v. Cushman & Wakefield*, 144 N.J. 120, 127 (N.J. 1996); *see also Mehlman v. Mobil Oil Corp.*, 153 N.J. 163, 179 (N.J. 1998) (describing CEPA as a "whistleblower" statute).

As discussed above, 29 U.S.C. § 1140 applies to "benefits-denying" retaliation.  It also prevents retaliation against a person who "has given information or has testified or is about to testify in any inquiry or proceeding relating to" ERISA, and as such, § 1140 contains a "whistleblower" safeguard.  *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 220 (3d Cir.

2010).  But the defendants have not shown either the absence of an independent legal basis for

liability or that an ERISA retaliatory motive was the main or even a substantial reason that

Caivano was terminated.  Neither in their papers nor during counsel's oral argument did the

defendants mention this aspect of § 1140, nor did they establish that Caivano's disclosures

during the investigation were other than what he claims in the complaint: whistleblowing about

the finances of the Local in general.  The cases relied upon by the defendants, such as *Bunner v.*

*PSE & G*, No. 11-2744, 2012 WL 1044313 (D.N.J. Mar. 9, 2012) (Waldor, Mag. J.), *report and*

*recommendation adopted*, 2012 WL 1059751 (D.N.J. Mar. 27, 2012) (Salas, J.), are

distinguishable because they dealt with claims that were "based on" a benefits-defeating motive,

*id.* at *5; here, the ERISA motive, if it existed, has not been shown by the defendants to be the

reason for Caivano's termination.  Defendants have also not argued that Caivano would have

standing to bring a §1140 claim in this context.  *Confer v. Custom Eng'g Co.*, 952 F.2d 34, 39

(3d Cir. 1991) (requiring fiduciaries to have discretionary roles).  Because the defendants have

not met their burden, the Court finds that the CEPA claim is not completely preempted, is not

removable, and remains a state-law claim.

The final employment-related claim, common-law wrongful discharge, appears to repeat

the allegations contained in the CEPA claim.  As a result, it is not removable for substantially the

same reasons discussed above.

C) Contract Claims

Counts 4 through 7 allege, on various theories, that the defendants breached their

contractual obligations to Caivano by failing to tender certain benefits.  In count 4, Caivano

represents that he was owed "severance and lifetime medical benefits," but that these had not

11

materialized.  Count 5, alleging promissory estoppel, relates to the allege promise by the defendants to compensate Caivano for the medical coverage he declined while covered under his wife's separate plan, while also addressing the promise of severance.  Count 6 is an unjust enrichment claim alleging that the defendants have not sent him his pension funds to be rolled over into another account, and have retained his payments without compensating him.  Finally, count 7, under breach of implied covenant of good faith and fair dealing, accuses the defendants of acting in bad faith by denying Caivano the benefits of his employment contracts—which require the defendants to "refrain from taking any action to frustrate or prevent" his receipt of the benefits of those contracts—by refusing to allow him access to (or information about) his pension funds.

At argument, Caivano's attorney stressed the second *Pascack Valley* prong, whether another legal duty supports these claims, by arguing that each one of them arises out of an independent contractual relationship or promise made either because Caivano was a longstanding employee of the Union or, in the alternative, a member of the Local's executive board.  For example, as alleged in paragraph 27 of the complaint and further developed on page 15 of his moving brief, Caivano contended that the promise of lifetime benefits, regardless of the source of those benefits, derives from a commitment made in either a single or multiple meetings of the executive board.

In *Pascack Valley*, the Third Circuit identified an independent legal duty that defeated complete preemption when the resolution of the lawsuit depended on an interpretation of "third-party contracts executed by the Plan that are independent of the Plan itself."  *Pascack Valley*, 388 F.3d at 402.  Even though the claims were derived from an ERISA plan, and existed only because of that plan, the presence of the additional contract created a legal duty independent of

ERISA that the parties could sue to enforce.  *See id.*  Further, at issue was not the "right" to

payment, but the total payment amount that was separately established by the third-party, non-

ERISA-plan contract.  *Id.* at 404.  Those factors, in the company of others, defeated complete

preemption.

Cases from outside this Circuit apply tests identical to *Pascack Valley* and are instructive.

The Second Circuit held against complete preemption in a case alleging that the defendants

"reneged on their promise to maintain certain benefits and pension plans," because those

obligations arose from "a separate promise that references various benefit plans, none of which

directly applies to [the plaintiff] by its terms, as a means of establishing the value of that

promise."  *Stevenson v. Bank of N.Y. Co.*, 609 F.3d 56, 58, 60–61 (2d Cir. 2010).

District court cases within the Second Circuit also hold that contracts can independently

modify terms of ERISA plans without leading to preemption.  For example, in *Cantor v.*

*American Banknote Corp.*, No. 06 Civ. 1392, 2007 WL 3084966 (S.D.N.Y. Oct. 22, 2007), the

district court held that ERISA did not preempt a breach claim, because the contract

independently modified the terms of a preexisting plan.  *Id.* at *6.  Similarly, in *Cotter v. Milly*

*LLC*, No. 09 CIV. 04639, 2010 WL 286614 (S.D.N.Y. Jan. 22, 2010), the court found that a

breach claim targeting an inducement to employment was based on an independent legal duty

that was not preempted by ERISA.  *See id.* at *7–8.

Here, the promise made in the 1993 minutes described in count 4 does not speak of

eligibility under the Welfare Fund, or even participation in the Fund, although it does designate

the Fund as the source of the benefits.  If lifetime benefits from the Fund amounted to a separate

employment promise made to Caivano that was not based on his participation in the Fund—and

13

as the defendants concede, he was not a participant through 2010—the benefits arguably arose out of a separate and independent legal obligation.

On their face and in context, the remaining contract claims arise out of independent contractual obligations. For example, for Caivano's claim for severance benefits to be an ERISA claim, the defendants would have to show the existence of an administrative scheme, which they have not done. *See Shaver v. Siemens Corp.*, 670 F.3d 462, 476–77 (3d Cir. 2012). In the absence of any sort of administrative scheme, a one-time severance benefit may not qualify as an ERISA plan, and thus claims for severance will not arise under ERISA. *See Peace v. Am. Gen. Life Ins. Co.*, 462 F.3d 437, 440–41 (5th Cir. 2006) (without an administrative scheme, "one-time severance payments do not constitute an employee benefit plan under ERISA"). His claims for payments representing what the Welfare Fund saved while he was not enrolled in health benefits pertain to rights allegedly accruing while he was not a participant in a Fund. Finally, the Court reads the Pension Fund-related claims as accusing the defendants of impeding access to his pension account by refusing to cooperate with his requests, conduct similar to his claims of stonewalling regarding his other claimed contractual rights. As such, these are not claims for benefits under 29 U.S.C. § 1132(a)(1). Moreover, to the extent that these claims could fall under 29 U.S.C. § 1132(a)(3), the defendants have not argued that they do and have failed to carry their burden of showing complete preemption.

In light of the above, the Court holds that the defendants have not satisfied the *Pascack Valley* test. Caivano has persuasively argued, and the defendants have not rebutted, the presence of an independent legal basis separate and distinct from any rights he may have under ERISA. Accordingly, the contractual claims are not completely preempted.

## IV. Conclusion

Because none of the claims is completely preempted by ERISA, the Court cannot

exercise subject-matter jurisdiction.  Accordingly, the Court may not rule on the International's

motion to dismiss.  Plaintiff's motion to remand to the Hudson County Superior Court is granted,

and an appropriate order will be entered.


Dated: June 30, 2014                                          /s/ Katharine S. Hayden
                                                              Katharine S. Hayden, U.S.D.J.